My name is Robert Sheritz and I represent the appellant Deborah Rasby. Today we are asking the court to overturn the district court's decision granting the defendant's motion for summary judgment. I believe the primary issue in this case is whether or not a partner in a fiduciary majority shareholder can coerce and manipulate a minority shareholder into selling her shares at radically below fair market value. I'm going to address this by asking the court three simple questions. First, is there a question of fact as to whether or not Deborah Rasby was under economic duress when she signed the unit purchase agreement? Second, is there a question of fact as to whether or not Mr. Pillen made material and fraudulent misrepresentations to Ms. Rasby? And third, whether there is a question of fact as to whether Mr. Pillen breached his fiduciary duties owed to Deborah Rasby? If I may, a brief recitation of the facts in this case, Deborah Rasby and James Pillen jointly owned a series of entities that were all in the swine industry, starting with PST, Progressive Swine Technology in 1994. They worked together for several decades, up until May of 2011, Deborah Rasby retires. Mr. Pillen's hostilities increased dramatically after her retirement. He did several things, such as increasing his salary from $100,000 to $1 million. That has a direct causal relationship to decreasing the distributions that Ms. Rasby would receive. He did a series of other things, such as shutting off distributions, then he would turn them back on, then he would refuse to give financial information. This culminated with the April 9, 2012 letter, under which Mr. Pillen sends a threatening letter stating he is going to liquidate PST, he is going to shut off the distributions from all the other entities, and he then makes a take-it-or-leave-it offer at well below the fair market value of Deborah Rasby's shares. She is coerced into signing the unit purchase agreement and sells her shares to Mr. Rasby. So the first issue I'll address is whether or not there's a question of fact as to if there is duress in this case towards the execution of the unit purchase agreement. So in Nebraska, there's a two-part test, whether there is force brought to bear and whether that force is unjust, unconscionable, or illegal. I think or is the operative word here, I believe, in Mr. Pillen's briefing. They would like to suggest that we would have to show that there is illegal activity that takes place. And that's simply not the standard. The court needs to find that there is a question of fact as to the application that the agreement on its face is unjust, unconscionable, or illegal. Looking at the facts... Yes, Judge. It looks to me like, as I was looking at Nebraska law, I was having a hard time finding a case where a person who was a business person, who was represented by counsel, and then entered into an agreement, they found duress or coercion. Are you aware of any case where that's happened? Well, I think that on the same exact facts that this was a business person represented by counsel who enters into an agreement, Judge, I'm not sure about the exact same fact pattern. However, I think you can draw parallels to several cases such as City of Scotts Bluff v. Waste Management, where it was a governmental agency clearly represented by counsel and clearly the governmental authority has some power, but the court still found that they were coerced and forced into a situation that was untenable. I think that... Maybe covered by the usual government always wins rule. Well, and the end of, what was it, 40 tons of trash that are piling up every week. Certainly, Judge. I mean, that's much different, that's much more dramatic duress than we are talking about here. Well, I think that when you have a woman who worked at a business for her entire life, built a business, and now she was facing a situation where bankruptcy is going to occur. She had $500,000 of annual imputed tax obligation. So if she was not able to receive distributions... Because of losses she'd taken before and chose not to carry forward, right, is what closing counsel said. Well, I think that... Her financial planning was the, as usual, the source of duress. Well, I don't think that she anticipated that Mr. Pillen was going to shut off distributions. So I think that whether or not she took, how she filed her taxes, I don't think... If he's got a right to do it, it doesn't matter whether minority shareholders anticipates it or not. I don't believe that he does have a right to do it. I think that the authority that they rely on... Wait, wait, wait. Boy, you've got to educate me on that one. Why not? Well, the authority that Mr. Pillen relies on for why a majority shareholder can simply shut off distributions is a case where distributions were never made and the shareholder was saying, I would like to get... I'm not talking about cases. I'm just... As a business proposition, a sufficient majority of the shareholders can dissolve. They can decide not to declare dividends. They can selectively raise salaries and therefore reduce the revenues available to distribute to shareholders. This is just... I would certainly agree with you, Your Honor. This is free economy and corporate law. That Mr. Pillen would have the right to do those things if it was done for a legitimate purpose. The problem in this case... We don't have juries decide what's a legitimate business purpose, whether Time Warner and AT&T have legitimate purpose in wanting to merge as opposed to what the government thinks. It's all to beat up on consumers. With respect, Your Honor, I wasn't drawing an analogy to a legitimate business purpose. I was saying that the only purpose for threatening to do these things was to get Deb Raspi to not, in fact, shut off distributions. Minority shareholders have been squeezing out minority shareholders without per se liability for eons. Well, if the law in the Eighth Circuit is that a majority shareholder can just eliminate a minority shareholder, then I mean... That's not the law. I mean, she had the right to litigate. She had the right to say, okay, you want to liquidate this corporation and wind down its affairs? I'm entitled to X, well, what, 10% of whatever the value of this is, and I can either force a liquidation by sale, which means it's got to go out and we're going to sell it either as an ongoing business or we're going to sell it piece by piece. I mean, she always had the... Right up until the time she signed, she always had the right to say, no dice, litigate. Now you say there's duress, which takes away that freedom to litigate. Yes, Your Honor. And so what exactly was that duress? I think that there's multiple aspects of this, and it was because the fiduciary relationship, whereas Mr. Pillen controlled the money and controlled the distributions, they were members of a closely held corporation, Your Honor. So in Nebraska, members of a closely held corporation owe each other the same fiduciary duties as members of partnerships. So there's a duty of honesty and a duty of loyalty. So the majority shareholder cannot just simply... I don't know what case... Certainly, Judge. I know that this is a general matter of corporate law. Majority shareholders have some duty to minority shareholders, but it's not like partners. In Nebraska, they are actually treated the same as partners in Bellino v. McGrath North and Anderson v. Bellino. Cases both talk about the stringent relationships of partnerships of members of a closely held corporation. Because in Nebraska, they say a closely held corporation is actually a partnership under a different name. And that's precisely what we have here. We do have the corporate formalities, but really when you have a... What makes it closely held? The closely held corporation? Yeah. There's only two owners. Mr. Pillen was a 90% shareholder, and Debra Aspie was 10%. So what? Well, it's a closely held corporation, I believe, by... By what definition? Well, it's not publicly traded, Your Honor. Is it businesses or what? Yes. I think that, by definition, it is a closely held company in the fact that she could not easily transfer her shares. And when... She has dissenting shareholder rights, unless Nebraska corporate law is different than most states. The issue, before she could litigate, Your Honor, Mr. Pillen knows that she relies on these distributions as her only source of income. He stops the distributions. So then she doesn't have enough money to pay the tax obligations and to litigate. This is different than a normal lawsuit. He's a very sophisticated corporate lawyer, who probably wasn't working for nothing. Right. How does he know that he's, by stopping distributions or increasing salaries so there isn't money for distributions, that he's preventing her from exercising her rights as a minority shareholder? He knows that she has the imputed tax obligations each year. She also has an asset that's 10% of this company that she can use to then go borrow some money and fund a litigation. And he is saying he's going to liquidate PST. So the... It's still an asset. He's not going to liquidate it for nothing. He says that... Because PST was a management company. The value of the company was managing all these interrelated entities. And so PST was highly cash lucrative. If you went on liquidation value and you didn't value this company on a growing concern basis, it would be radically lower. If he liquidates, she gets 10% of a lot of cash. And if he would have liquidated, he could have done that. But he didn't. But then she'd already entered into an agreement. Well, I think the evidence shows that he never intended on liquidating PST. He said that he was liquidating it because it no longer met business... That may be a disputed issue of fact. I don't think it's clear to the way... And it's clear to what you just said. Well, I think that... I think there are several disputed issues of fact, Your Honor. But I think that the... A statement of intention is not fraudulent anyway. But a statement of intention, when you are the person who controls the power to make that action, it is. Because he had the power to liquidate PST. Only if you make the statement with the intention not to perform it. And I certainly think that he was not intending on performing this whatsoever. He did. He did not, Your Honor. The district court made a factual determination that he liquidated PST. He, in fact, did not. What he did is he formed a new entity called Pillum Family Farms. One day, people showed up to work, and they worked for PST. The next day, they showed up to work, and now they work for Pillum Family Farms. All the assets, all the accounts receivables, all the office chairs, all the employees, all the management agreements got swept over to Pillum. He started out by saying there's fraud here. What you're talking about is not fraud. I think it was a fraudulent misrepresentation to induce her to sell her shares, saying he's going to liquidate the company. But instead, he continues operating the company on a daily basis. And that's Pillum Family Farms. She didn't believe he was going to stop his enterprise. I think that she testified she was terrified. She felt like she was drowning. She was suffocating. She didn't know what to do. And if he did liquidate the company, then that would be one thing. He did not do that. He simply started. He writes a letter saying, you behave or I won't vote for you to be on the Nebraska Board of Trustees. I mean, she was a tough cookie herself. Yes, that took place after the fact, Your Honor. But it was not unlike what was going on all the time, what I infer from the briefs and what I've seen in the record. About Mr. Pillum being a difficult individual or? Both of them. Well, I think that. Tough bargainers. I don't think that this was a bargain. And I think that hard bargaining, if we look at the Scotts Bluff case, the court expressly reject what Mr. Pillum refers to as merely hard bargaining. Because when you are the stronger party and you control what makes the other party vulnerable, it is no longer hard bargaining, Your Honor. What's the evidence? 100% shareholders can have hard bargaining. They don't have as good a position. They don't have as much power. It's not. According to the city of Scotts Bluff, Your Honor, with respect, the court said that. Okay. And when you exploit the superior bargaining position, that's what shifts over from mere hard bargaining into economic duress. What's the evidence that he didn't intend to liquidate it if she didn't do the deal? Well, because he said the only real difference was between Pillum Family Farms and PST was that Deb Rasby was no longer a member. His business. That's after the fact. She had done the deal. His business. What's the evidence that before she did the deal, he didn't intend to liquidate? Well, I think it's circumstantial that there's no. Obviously, there's no evidence. Sounds like it's speculative. Well, I think it would be a question of fact for the jury to determine if he was going to. There's not any evidence. Well, if the question is whether or not he was going to actually liquidate the company, I think that he needed a management company to run this. I don't think that just because he didn't do it afterwards gets you there. With respect, Your Honor, I think that the evidence, there's sufficient evidence to show there's a question of fact as to whether or not he sent the letter with the sole purpose to coerce her into selling her shares. I would like to reserve the remainder of my time for rebuttal. Thank you, Your Honor. Mr. Engler. Good morning, Your Honors. May it please the Court. My name is Tim Engler. I'm with the Remboldt-Ludke Law Firm. Our firm represents the Apple lead, Dr. James Pillen, a veterinarian from Columbus, Nebraska. In the spring of 2012, Deborah Rasby was confronted with the prospect of the possibility of extensive, costly minority shareholder litigation. She was also faced with potential for significant adverse tax consequences. In light of these two concerns, she made a choice. The choice that she made was to sell her stock minority interest in five companies that were given to her by James Pillen, 10% in four and 5% in one, for $2,350,000. In addition to transferring her stock for this sum of money, she also obtained a full and complete release from any actions that she had while she was employed by these entities, by PST. And finally, she gave a full and complete release to Jim Pillen. Admittedly, this was a difficult choice. But let me put this choice in context. Deborah Rasby was an educated and sophisticated woman. She was educated as an accountant and served as an accountant with over 20 years in the business. In addition to her financial sophistication, she retained, more than a year before this transaction occurred, more than a year before this transaction occurred, she retained competent and skilled commercial counsel, a lawyer in Omaha, Nebraska, by the name of Roger Wells. Roger Wells is the head of the transactional department at McGrath North, one of the largest law firms in the state of Nebraska, one of the largest law firms in the Midwest. He's president of the firm. He has extensive experience in negotiating complex commercial transactions. He negotiated, in his career, deals worth over a billion dollars. But it wasn't just Mr. Wells that was representing Deborah Rasby. He also engaged his partner, a commercial, experienced litigator by the name of William Hargens. They, that team, worked tirelessly to try and evaluate all options that she had available to her. She also had her husband, Doug Rasby, a sophisticated financial person as well. Throughout the year that she was working with McGrath North, she evaluated carefully her options, and she had options. She considered the following options. Number one, sell her stock at the best price she could negotiate using whatever available negotiating techniques she had at her disposal through Roger Wells. She had the opportunity, the option, to stay and fight. She was a minority shareholder. She could not be compelled to transfer her interest, so she could stay and fight. She had the opportunity to sell her interests to a third party. Admittedly, this would be difficult when you're a minority shareholder in an entity, but it is an option that was not only considered but also slightly pursued. Finally, she had the option to seek judicial dissolution of these companies if there was minority oppression. There is a clear statute that exists in Nebraska to provide this relief to minority shareholders, that they can force judicial dissolution or force the minority shareholder to purchase her interests without taking into account minority shareholder discounts. All of these options were available to her. Granted, these difficult choices do not equate to economic duress. Litigation was always an acceptable alternative. Litigation is uncertain, is costly, is expensive. But it did exist, and it was something that was available to her to consider. I'd like to point the court to the Rissman decision out of the Seventh Circuit, Judge Easterbrook, a case that is factually very similar to this dispute as well. In that case, you had two brothers. One was a majority shareholder, one was a minority shareholder. The majority shareholder threatened not to pay tax distributions, wanted to force his brother out, was going to haul him through the courts for a long period of time. Eventually, they reached a negotiated transaction whereby he sold his interest in the company for $17 million. A little over a year and a half later, the owner now, prior majority shareholder, sold the company for $336 million. The minority shareholder's interest would have been over $110 million. In that case, Judge Easterbrook said there was not economic duress because litigation was always an alternative available to him. And the Rissman decision also points out some very good examples of hard choices that did not constitute economic duress. It references the choice that someone accused of first-degree murder must make when offered a plea deal to avoid the death penalty. It talked about the older worker who was offered severance and forced to retire and consider whether he wants to accept that economic package or whether he wants to pursue age discrimination. Those are the type of choices, although difficult, do not equate to economic duress. There's one other thing that is important to point out in this case is that if, in fact, there was economic duress, it means the contract is not void. It means the contract is merely voidable. And if, in fact, it is voidable, the law is clear in Nebraska that you must act promptly once that economic duress has been removed. In this case, she waited over three years after she obtained $2,350,000 to pursue litigation. She developed a war chest in order to go back and see if she could get more. This should not be allowed. There are two things I'd like to have you consider. Do you think that duress would allow the voiding of the release but not the contract? Mr. Cordoon recognized a possible difference there. In other words, she wants to ratify the contract in the sense of keeping the $2.3 million, and she wants to void the release so she can bring claims in addition to the fruit of the contract. That's what I would infer is the objective here. I don't think rescission law would get you there. Right, you can't rescind this transaction because it's impossible to do so. And it's interesting that... Well, you could rescind if she gave the money back. That's usually rescission of a performed agreement is possible if there's a tender of benefits received. All things of value, including interest that would be payable on the sum. And also there's the corporation, the entity in which one of the entities that she transfers no longer exists. How can you bring that interest back? But what's interesting about your... Yeah, but why can you void the release if... Why can you rescind the release if you can't rescind the contract? I agree. In fact, how the release came about is interesting because the first draft of the stock purchase agreement contained no mention of a release. The release was initially brought into the transaction by Rasby's lawyer. She wanted, he wanted, Roger Wells wanted to put in their release. When that draft came... I understand that. I'm not sure that... That doesn't go to the question, though. I apologize. No, I think it's more a question for... It's a question that hasn't... District court didn't need to reach. Right, it would be, it seems like... I find it very unlikely that the law of equity would allow you to just pick and choose the provisions of a contract when you're claiming that the whole contract was coerced. I would agree. It doesn't seem like it's fair to be able to allow someone to pick and choose what parts of a contract they feel is subject to rest and which parts are not. So the two things I'd like you to consider is the impact reversal in this case would have. Number one... Can I ask a question? Absolutely. You argued that the misrepresentation claim is barred by the release. Is that right? I don't think the district court thought so. No, I... That question, if there is fraud that is not discovered at the time of the release, it would not likely be released. That would be my understanding. I would think, I would have to agree with that. Thank you. But the two things to consider if there is a reversal in this case. Number one, what do transactional lawyers representing someone like Dr. Pillen, what are they going to do to try and avoid this situation coming up in the future? How can they not... How can they plan against that? Do commercial closings have to turn into what we see in the criminal context? When a judge accepts a guilty plea, and I don't do a lot of criminal work, but I'm amazed at when I watch a district court judge or magistrate judge accept a guilty plea and all the questions they go through about voluntary duress, about have you been promised anything, have you made any coercion threats, is that how a closing is now going to occur in a commercial transaction where you have someone who you believe is not happy with it? Do you have to go through all those questions and have a court reporter there? That would be absurd. And the second thing that you must consider, the ramifications of this, is what impact is it going to have on any type of settlement in either a commercial litigation or any litigation, civil litigation at all? It certainly would chill the ability of parties to enter into settlements when they're not happy. In fact, as you would expect, parties will talk settlement in any context, and so hypothetically Dr. Pillen would ask his lawyers if there was a settlement agreement after this litigation was filed, how do I know that settlement is going to be binding? How do I know that release is going to be valid? It certainly is a legitimate question. It is one in which when you have the circumstances that we have here, a sophisticated plaintiff, a law firm that works on this for over a year to assist her on that, assist her in this transaction, to now simply be faced with the prospect that that can be set aside more than three years later in an attempt to get more money out of a deal, in an attempt to get another million, another two million, another five million, whatever you can get, there's certainly no downside. So given that adverse impact that this decision could have, I'd ask the court to affirm the decision of Judge Battalion. And I know it's been a long morning, so unless you have any more questions, I think I'm finished with my remarks. Thank you. Mr. Sherratts for mobile. Thank you, Your Honor. And Judge, to your point, the issue of whether or not, what happens to the attack on the contract that was issued under duress, you're right, that was not something that was at issue under the appeal. I think that this was touched on in the original motion to dismiss. They moved because they said that there was a lack of tender and the court ruled that tender is not necessary if it would be futile. And there was also authority that if there was a sum owed, the parties agreed that she had some value, so she could sue stating that it was under duress and it would just be for the difference in value logistically under the contract. And, Judge Erickson, to answer your question about a similar situation in Nebraska, I would refer to the Gilkerson case where you have a sophisticated individual who's a vice president of a company, who's employed, who gets coerced into signing a new employment agreement. But with my final 18 seconds, I'll simply say that the fact that he said he was shutting off distributions, yet he continued giving himself distributions in June, July, and September, that was a fraudulent misrepresentation to induce her into signing the contract and also saying he was going to liquidate PST when he never in fact did. We would ask you to reverse and remand for further proceedings. Thank you, Your Honors. Thank you, Counsel. The case has been well-briefed and argued, and we'll send it under advisement. Does that complete the argument, Your Honor? It does, Your Honor. Very good. The court will be in recess until 8.30 tomorrow morning. Thank you, Your Honor. Okay. My computer is dead. Tomorrow's going to be a kick. So how long have you been over there this time? Six and a half.  Yes, it was forever. They thought it was forever. No. That was a death blow.